In the Matter of the Estate of MYRTLE L. THOMPSON, Deceased.

Surrogate's Court, New York County, April 7, 1947.

*H. Eustace Williams* for Emma G. Neal, as executrix of Myrtle L. Thompson, deceased, petitioner.

DELEHANTY, S. Deceased subscribed the instrument propounded as her will under text which said: " I have hereunto subscribed my name at the end hereof, *and sealed these presents* and do publish and declare the foregoing as and for my last will * * *." (Italics supplied.) To the right of deceased's subscription of the will there was a seal affixed. The subscribing witnesses executed an attestation clause in which they certified thus: " The above named testatrix in our presence subscribed *and sealed* the foregoing instrument * * *." (Italics supplied.) The instrument was executed on the day before deceased entered a hospital. The paper was kept by a sister of deceased at the direction of deceased until the latter left the hospital on December 12, 1946. It was then redelivered to deceased who kept it until December 21, 1946, when she re-entered the hospital. On the re-entry of deceased to the hospital she had the instrument again delivered to her sister who kept it until December 23, 1946. On that date it

was delivered to deceased. It was then in its original condition and wholly intact. Deceased had it for about an hour. There is circumstantial proof that she placed it in a box in which she kept papers regarded by her as important. She handed this box to a social worker with whom she had become friendly while a patient in the hospital. This social worker kept the box with the contents until after deceased's death on January 9, 1947. Thereafter the box was examined and in it the propounded paper was found in the condition in which it has been presented to the court.

When executed the instrument consisted of three sheets of paper. These sheets were bound under an outside cover. The second sheet bore the signature and seal of deceased and a part of the attestation clause. The witnesses signed to the left of deceased's name on the second sheet and also on the third sheet at the end of the attestation clause. The attorney who drew the will perforated the sheets and the outside cover so as to permit the fastening of the will at the top by a ribbon which was carried down between the first and second sheets so that it could be fastened by the seal which covered the ribbon and also adhered to the surface of the second page of the instrument to the right of deceased's signature. In addition to the fastening by ribbon the sheets were also fastened to the cover of the instrument by a staple at the upper right corner and a like staple at the upper left hand corner. When the instrument was found in the box of deceased after death the ribbon and the seal were completely missing. Portions of the top of all three sheets and of the cover of the instrument were missing. The fabric of the paper and of the cover which had been the situs of the stapling in the upper right hand corner was missing and the remaining parts of the sheets were held within what was left of the cover only by the staple at the upper left hand corner. None of the text of the instrument was affected by the tearing. The signature of deceased and of the witnesses were likewise unaffected by any tearing. The attorney who drew it testified that on the occasion of the execution of the instrument and as a part of the ceremony of execution he had expressly advised deceased thus: " I told her then that in case she wants to revoke it all she needs to do would be to break the seal, tear the ribbon, and that would act as a revocation there." On the date of the latest delivery to deceased of the instrument in its intact condition she spoke of intending to change her will and told the person who delivered the instrument to her that her lawyers had told her that " all she would

have to do was to clip a string on it ''. On this occasion deceased was entirely competent and capable of understanding the nature of her acts and conduct. The question is presented whether or not the instrument was revoked by deceased.

The pertinent provision of law is section 34 of Decedent Estate Law which says: '' No will in writing * * * shall be revoked * * * unless such will be burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same * * *.'' The text just quoted has its origin in the revised statutes of 1830. The text of the revised statutes in turn derived from an earlier statute which had its origin in the Statute of Frauds of England and which was in effect at the time the revisers began their work. The English statute referred to revocation '' by burning, cancelling, tearing or obliterating ''. When the revisers of 1827–1830 undertook their work they had for source material in the matter of will revocations the then extant revised laws prepared under statutory authority by Van Ness and Woodworth (see Vol. 1, Rev. Laws of N. Y., 1813, p. 365). The text of the 1813 revision says: '' * * * by burning, cancelling, tearing or obliterating '' — exactly the text of the English Statute of Frauds. The marginal references in the published laws of 1813 show that the English statute was consciously copied. The revisers of 1827–1830 had no thought of changing the purport or meaning of the prior statutory text. They make no comment on the subject and patently all they did was to paraphrase the old statute without making any change in meaning. They were undoubtedly aware of the decision rendered in 1825 by the then Supreme Court of the State of New York in *Dan* v. *Brown* (4 Cow. 483). At page 490 of this report the court said: '' Revocation is an act of the mind, which must be demonstrated by some outward and visible sign of revocation. The statute has prescribed four. If any of them are performed in the slightest manner, joined with a declared intention to revoke, it will be an effectual revocation.'' In support of this declaration the New York court cited (by reference to '' 2 Bl. Rep. 1044 '') the case of *Bibb* v. *Thomas* (2 Wm. Bl. 1043, 1044, 96 Eng. Rep. 613) and stated the law of New York in almost exactly the same language as that used by the bench of English judges. There is evident in the New York decision a deliberate intention to declare the law of New York of that day to be in agreement with the decisions of English judges respecting the operation of the English Statute of Frauds. And since the revisers with this background of judicial decision used the

language which is now in section 34 of Decedent Estate Law it must be held that they intended to continue the rule of law then recently declared by our court on the basis of the English authorities.

An English case ruled explicitly in 1821 on the factual situation here present (*Nasmyth* v. *Hare*, 1 Shaw App. 65, 83). There the Court of Appeals had before it a holograph which was valid without a seal under the law of Scotland where the testator was domiciled. It had in fact been sealed by the testator at the time of execution. When found after death the seal had been cut off. Lord Chancellor ELDON said (p. 73): " *   *   * I take it, according to all principle, that if a paper cancelled, and the seal cut off, or the name erased, is found in a fast-locked place of the testator, the prima facie inference from that is — not that the testator meant that it should continue to be his will — but that the testator was the person that did the act himself, which is found to be evidenced by the state of the paper found in his fast-locked closet." Later (p. 77-78), he said: " *   *   * It appears therefore to me, first, that a will had existed in a sealed state; secondly, that no seal was appended to the instrument when it was found. I am also satisfied that the seal was taken away by excision; and it appears to me also that this excision is prima facie to be taken to be an excision by his own act, and that, according to the principles which you apply to cases of this sort, the circumstance that it was found in his own custody, and in a place of security, and with this excision, is to be taken as evidence that it was his own act. I have before said, that there is nothing in our law — I have not been able to find that there is anything in the Scotch law — which requires the ceremony of sealing to make good a will of personal estate; but I do conceive it to be an universal principle in respect to wills of this sort, that any person may prescribe to himself terms and solemnities with respect to a will of personalty beyond that which the law requires him to observe, and that it appears in the body of the instruments that he has required — that he has said — that in testimony that this shall be his will, or as testimonies that this shall be his will, he does seal as well as sign it. Signature alone will not do. He has prescribed a law for himself, and it never can be according to principle, that the person who prima facie has in the first act prescribed to himself both those solemnities, can notwithstanding be considered as meaning, that if he takes away the evidence of one of these solemnities, although the other will be sufficient, if it had been originally the only

solemnity, are you therefore to infer that what he meant originally he no longer intends, and that he has altered that intention without making a memorandum of it. * * * if he might make a will for himself, I say that he has withdrawn the testimony which he had before prescribed, as a testimony which was to appear before it could be declared that he had a valid will. That is, in my judgment, his declaration that that instrument should have no longer that testamentary effect and character." In the same case Lord REDESDALE concurred and among other things said (p. 82): " * * * it was mutilated by tearing off the seal, which the testator himself had declared to be one of the ceremonies which he had imposed upon the instrument for the purpose of giving it validity. And I apprehend that, whether he tore off the seal, or whether he tore off the subscription, it is immaterial whichever it was; if it was a ceremony which he had stated to be a ceremony which he conceived fit to be annexed to it for the purpose of giving it validity, by removing that ceremony from it, he destroyed its validity."

In a later English case (*Price* v. *Powell*, 3 H. & N. 341, 157 Eng. Rep. 502) decided in 1858 the court had before it the question whether the new Statute of Wills of Victoria had altered the rule of law theretofore declared under the old Statute of Frauds of Charles II. The particular question in the case was whether the tearing off of a seal from a sealed testamentary instrument was sufficient as a revocation under the new act. The English court there said (p. 350): " There can be no doubt that prior to the new statute a will found in the testator's possession with the seal torn off was deemed to have been cancelled " (citing cases). It then went on to say: " And in our opinion as this will professed to be executed under seal, and was published and attested as a sealed instrument, when the seal was torn off it ceased to be the instrument which the testator professed to execute and to publish to the attesting witnesses, and through them to the world. It was, to use the expression of Mr. Justice COLERIDGE in *Doe* d. *Rees* v. *Harris* [6 A. & E. 209], ' destroyed in its entirety,' and ceased to be (by means of tearing) the instrument as and for which it had been published. We are therefore of opinion that the act of tearing in this case was sufficient, and that the will was thereby revoked * * *." To the same effect see *Davies* v. *Davies* (1 Lee 444, 161 Eng. Rep. 164).

The English rule, consciously adopted as the law of this State in the cited case of *Dan* v. *Brown* (4 Cow. 483, *supra*)

is supported by textwriters and by courts in other States. "Although sealing is not essential to the validity of a will, tearing off the seal works a total revocation, if the will professes to be executed and attested as a sealed instrument * * *." (30 Am. & Eng. Encyc. Law [2d ed.], p. 640.) "The tearing out of the seal and of part of the signature of the testatrix, and the obliteration of the names signed to the will, are a cancellation of the will." (*Matter of White*, 25 N. J. Eq. 501, 502, citing cases.) "If it is attempted to destroy the will by tearing, this may be done, though the will be not so torn to pieces as to be in the full definition of the term absolutely destroyed. A slight tearing is enough, though it extend to only a part or portion of the instrument. It has also been adjudged that where a will has been executed under seal, though a seal be unnecessary to its formality, the tearing off of the seal is a tearing within the meaning of the statute and effective as an act of revocation." (*Glass* v. *Scott*, 14 Col. App. 377, 383–384.) "Any act of tearing which is manifest upon the paper on which the will is written, however slight it may be, is an act of tearing within the meaning of the statute, if done with the intention of revoking the will. This is equally true whether a necessary part of the will is torn off, * * * or whether an unnecessary part of the will is torn away, such as a seal, where a will need not be under seal * * *." (1 Page on Wills [Lifetime ed.], § 428, pp. 772–773.)

On the history of the statutory text which has been herein outlined and on the basis of the authorities discussed the court holds that the integrity of the instrument as it was executed by deceased was destroyed by her act in tearing off the seal, the binding ribbon and the top portions of the sheets comprising the pages of the will and the cover of it. But because of the lack of recent authoritative appellate decisions in this State on the point here under consideration the court deems it appropriate to do no more in the present case than to say that in the circumstances present in this record it finds that this testamentary instrument was "torn" within the meaning of section 34 of Decedent Estate Law and that the tearing evidenced by the condition of the instrument was sufficient to revoke the will provided it was done by deceased with that intent and to accomplish that purpose. Such intent and purpose are also found by the court from the facts in this record (*Matter of Hopkins*, 172 N. Y. 360; *Matter of Crouse*, 205 App. Div. 135, affd. 238 N. Y. 583). Accordingly probate of the propounded instrument is refused.

**Submit decree accordingly.**